**NRM CORPORATION, Appellant,**

v.

**HERCULES INCORPORATED.**

No. 84–5230.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 1985.

Decided March 29, 1985.

Philip M. Risik, Chevy Chase, Md., with whom Daniel M. Ross, Chevy Chase, Md., was on the brief, for appellant.

John Lloyd Rice, Washington, D.C., with whom Clarence T. Kipps, Jr., Washington, D.C., was on the brief, for appellee.

Before WRIGHT, SCALIA, and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge Wright.

J. SKELLY WRIGHT, Circuit Judge:

NRM Corporation appeals from a District Court order dismissing its contract action against Hercules Incorporated on a motion for summary judgment. The dispute arises out of a contract under which NRM was to fabricate a device used in the production of rocket propellant. During the course of performance Hercules required NRM to make five adjustments in the original design. For each change Her-

cules solicited and NRM prepared a fixed-cost proposal. After the modifications were largely complete, NRM requested further payment for costs it had incurred as a result of delays and disruptions caused by the changes. When Hercules denied its liability, NRM sought relief in District Court.[1] The court, reasoning that NRM's agreement to make the five modifications at a fixed cost precluded all subsequent claims arising from those changes, granted Hercules' motion for summary judgment. Because we agree with NRM that the existence of genuine and material issues of fact make summary disposition improper, we now reverse.

## I. BACKGROUND

Hercules operates a government-owned, contractor-operated munitions plant in Lawrence, Kansas. In 1972 Hercules began to expand its facilities in preparation for the production of rocket propellant for the Army. To reduce hazards to personnel, production was to be entirely by remote control, with material travelling by conveyor to and from different parts of the plant.

In order to produce the propellant in the manner specified by the Army, Hercules needed to procure specialized mills, known as dewatering mills. In 1973, after a series of exchanges that need not be detailed here, Hercules agreed to NRM's proposal to produce the mills for a total price of $982,536. Although the parties agreed to a fixed amount for the work, the contract[2] contained a standard "changes clause," which gave Hercules the right unilaterally to order changes in the specifications. In the event any such changes were made, the clause gave NRM an entitlement to an "equitable adjustment" for the cost of those changes.[3]

---

1. Jurisdiction is founded on diversity of citizenship. 28 U.S.C. § 1332 (1982).

2. The original agreement was in the form of a purchase order. Although the parties quibble over terminology, there is no dispute that the document had the force of an enforceable bilateral contract to produce the dewatering mills in a certain manner and at a fixed price. For

convenience, we refer to the original agreement as "the contract."

By separate agreement NRM had also contracted to design the mills. This dispute concerns only the fabrication contract.

3. In pertinent part, the changes clause stated:

Hercules may at any time, by written order and without notice to sureties, if any, make changes or issue additional instructions with-

On five separate occasions Hercules indicated its intention to alter the original specifications. The first modification involved numerous small design changes, including changes in the position of several of the internal parts of each mill. In a letter dated October 25, 1973 Hercules requested that NRM submit "a firm, fixed price proposal" for the work.[4] Memorandum Opinion of the District Court (Mem. Op.), February 2, 1984, at 3, 6; Exhibit 2 attached to Hercules' Statement Of Material Facts As To Which There Is No Genuine Issue, filed June 8, 1979 (hereinafter cited as Appellee's Exhibits). On February 22 and again on June 7 NRM provided Hercules with a breakdown of the "total cost" of the changes. *Id.* In addition, the June communication included the following statement: "As we discussed during our last meeting, it is impractical to include any costs in the contract which has [*sic*] an unknown quantity." *Id.*; Mem. Op. at 7. A purchase order[5] sent to NRM by Hercules on June 26, 1974, the final correspondence concerning the first of the five modifications, stated that the "increase due to alteration" was $149,504 for a "Total Re-

vised Commitment" of $1,132,040.[6] Two days later NRM responded, formally stating that it agreed to the "new total contract purchase price" indicated by Hercules' prior correspondence. *Id.*

The second, third, and fifth modifications followed the pattern established in the first agreement. Again, for each change Hercules requested and received a price proposal, which was later memorialized in a purchase order. Once again, the orders, which were drafted by Hercules, noted a price labeled "Total Revised Commitment." Appellee's Exhibits 3, 4, & 6; Mem. Op. at 3-4, 8.

Negotiations concerning the fourth modification were more complex. The process began, as before, with a letter, dated February 28, 1975, requesting that NRM submit a proposal setting out its requirements for adding a "failsafe system" to the mills. Mem. Op. at 4. NRM responded on April 18th[7] with a proposed design for the change and an accompanying statement of costs. *Id.* On April 29th Hercules gave its informal approval to proceed with the modification. The next day NRM forwarded a written statement that the "total price"

---

in the general scope of this order in the drawings, designs or specifications * * *. If any such change causes an increase or decrease in the cost of or the time required for the performance of this order, an equitable adjustment in price * * * will be made. * * *

Exhibit 1 attached to Hercules' Statement Of Material Facts As To Which There Is No Genuine Issue, filed June 8, 1979, at Appendix "A" (hereinafter cited as Appellee's Exhibits).

4. Another communication, dated January 10, 1974, requested price proposals for several other small changes. Appellee's Exhibit 2. NRM's response apparently concerned the changes listed in both the October 24th and January 10th letters.

5. NRM maintains that under government contract law there is a distinction between a "purchase order" and a "purchase order alteration." For convenience, we use the term "purchase order" to refer to the form memorializing the cost of the modifications.

For each of the five modifications a purchase order, drafted under Hercules' letterhead, recorded the price of the changes. Although many, if not all, of the purchase orders were never signed by NRM, the parties do not dispute that on all five occasions they agreed to the

changes at some unspecified point during the course of the lengthy negotiations that preceded each change. NRM contends, however, that, while it agreed to perform the changes for the price later recorded in the purchase orders, it did not actually agree to the purchase orders themselves. The distinction is important, NRM maintains, because it undermines Hercules' reliance on the phrase "Total Revised Commitment" found in each of the five documents.

6. The order also stated:

The agreed upon price does not include feed screw rework changes (Item 4–D of the proposal dated February 22, 1974). Such changes will be negotiated when extent of work and estimated cost has been determined."

Appellee's Exhibit 2. The statement in the June 7 letter concerning the impracticability of cost estimates followed immediately after a reference to "Item 4D." Thus it is possible to read the statement as referring only to the cost of that item. The District Court appears to have assumed otherwise. Mem.Op. We, of course, express no view on this factual and, as we show below, material issue.

7. The District Court found that NRM responded on April 19th. The discrepancy is immaterial.

was $23,240.00, the precise amount later indicated in the now familiar Hercules purchase order. That document put the revised total contract price at $1,166,160. *Id.* at 4.

On July 15, 1975 NRM advised Hercules that it had recently "processed for production" the purchase order concerning the failsafe system. The letter indicated that "it is not possible at this juncture to establish a precise delivery schedule or all cost factors attributable to these changes." *Id.* at 5; Exhibit 72 attached to NRM's Motion For Partial Summary Judgment By Plaintiff As To Certain Defenses Raised In Defendant's Answer, filed August 8, 1980 (hereinafter cited as NRM Opposition Exhibits). A week later NRM again wrote Hercules, advising it that NRM was in the process of reviewing all the changes that had occurred over the entire course of the contract and suggesting that the purpose of the review was to "list all changes that have not been incorporated in the change orders issued to date." In the same letter NRM stated its intention to submit a claim for an "equitable price adjustment." Mem. Op. at 5, *quoting* NRM Opposition Exhibit 73.

Immediately prior to completion of the project NRM requested that Hercules reimburse it for more than $900,000 in damages allegedly incurred as a result of the delays and disruptions caused by Hercules during the course of the performance of the contract. Hercules, although acknowledging

that the "changes clause" created a general obligation to make equitable adjustments occasioned by mid-course modifications of the contract, refused to pay the full amount of the claim. It took the position that its acceptance of NRM's five fixed-price proposals precluded subsequent claims for delay and disruption damages. NRM, in contrast, contended that the parties understood that such damages were not incorporated into the price for the agreed-upon modifications and that, accordingly, its claim under the changes clause remained viable.

By the end of the summer of 1977 negotiations between the parties broke down and NRM filed suit in District Court. After months of discovery and numerous submissions of lengthy memoranda, the court granted Hercules' motion for summary judgment and dismissed the case with prejudice.[8] It held, presumably as a matter of law, that the five modifications had incorporated all costs that had been or might be caused by the changes. Although acknowledging that the June 1973 and July 1975 letters appeared to indicate NRM's intention to postpone final precise resolution of some of the costs occasioned by the changes, the court considered the letters insignificant because NRM had later agreed to a fixed, all-inclusive price.

## II. DISCUSSION

Analysis of NRM's claim requires that we differentiate between three distinct cat-

---

**8.** In addition to the central contention that payment of the agreed-to fixed price for the modifications precludes NRM's claim, Hercules' motion for summary judgment raised several affirmative defenses, including the assertion that the claim was time-barred. NRM later submitted for the District Court's consideration a document entitled "Motion For Partial Summary Judgment By Plaintiff As To Certain Defenses Raised In Defendant's Answer." The motion requested that the District Court strike several of Hercules' defenses. The court denied the motion at the same time that it granted Hercules' motion for summary judgment. Its memorandum opinion, however, focused excusively on the question whether NRM's agreement to a fixed price for the modifications precluded a later claim for impact costs.

NRM requests that we reverse the District Court's denial of its motion for partial summary judgment and, in effect, hold as a matter of law that its claim is not time-barred. Hercules represents that the District Court never addressed this issue because Hercules had withdrawn the question from the court's consideration "to focus on a single dispositive issue—the defense of full payment." Brief of appellee at 31. It states further that its withdrawal was on the condition that it could pursue the defense in the event its own motion was denied.

The timeliness issue appears to hinge on the disputed and material factual issue of the intended scope of the agreement. In any case, because the issue was neither fully briefed by the parties nor discussed by the District Court, we consider it the fairer course to permit Hercules to raise the defense on remand.

egories of costs incurred in the course of performing the contract. The *first* category comprises the cost of the modifications themselves. For example, if Hercules requested that NRM deviate from the original specifications and add a failsafe system, NRM would incur the expense of procuring or producing the item. There is no dispute concerning the status of these costs: All agree that NRM's fixed price proposals fully cover them.[9] The *second* category concerns not the cost *of* the changes but the cost *created by* the changes on other "unchanged" parts of the project. *See Chantilly Construction Corp.*, 81–1 BCA ¶ 14,863 at 73396 (ASBCA No. 24138) (1980) (also discussing the effect of modifications on "unchanged work"). To continue the example, requesting that NRM install a failsafe system might have caused a five-week delay, during which time NRM would be required to pay its overhead and other fixed costs for the entire project. Similarly, the change might have disrupted other parts of the work with a concomitant increase in costs. The *third* category includes costs stemming from delays not caused by the changes at all. For example, NRM alleges that it suffered losses because on one occasion Hercules was forced to postpone payment of its obligations when its government funding was suspended. The dispute centers around delay costs in the last two categories. NRM maintains that these costs were not included in the fixed price proposals it submitted for each of the five modifications.

**9.** We note, however, that many of the cases cited by Hercules for the proposition that a party may not seek more than an agreed-upon fixed price concern instances in which the contractor sought to recover a higher amount for the cost of the change itself. *See, e.g., Capitol Temptrol Corp.*, 84–2 BCA ¶ 17,332 (ASBCA No. 27859) (1984) (contractor who agreed to fixed price for contract modification requiring performance of certain tests may not recover additional cost of electricity expended in preparation for performing those tests). Other cases relied on by Hercules involve efforts to recover more than the fixed price set out in the original agreement because of changed or unanticipated

### A. Costs Not Associated With the Changes

■ Rule 56(e) of the Federal Rules of Civil Procedure requires that the party opposing a motion for summary judgment "may not rest on the mere allegations or denials of his pleading," but must "set forth specific facts showing that there is a genuine issue for trial." Local Rule 1–9(i) of the United States District Court for the District of Columbia imposes an explicit requirement that parties opposing summary judgment file "a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." As we have stated on numerous occasions, a party may not seek to overturn the grant of summary judgment by alleging unresolved factual disputes not previously presented to the trial court. *Tarpley v. Greene,* 684 F.2d 1, 7 (D.C.Cir.1982); *Gardels v. CIA,* 637 F.2d 770, 773 (D.C.Cir. 1980). To permit him to do so for the first time on appeal would "undermine the integrity of the adversarial process and the authority of the District Court to fairly and effectively control the litigation before it." *Tarpley v. Greene, supra,* 684 F.2d at 7 n.17.

Under this standard, it would be clearly inappropriate to reverse the District Court's grant of summary judgment on the basis of NRM's allegation that a genuine dispute exists with respect to costs allegedly stemming from conduct entirely unconnected to the five modifications. Although NRM submitted the required statement of genuine issues, we search it in vain for

circumstances discovered during the course of performance. *See, e.g., United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) (one who agrees to build a structure for a lump sum undertakes the risk of soil subsidence) (dictum).

Neither set of cases is directly relevant to the question presented in this controversy. Nor is the fact that the case involves a "fixed-price" rather than a "cost-reimbursement" contract. NRM does not dispute that it agreed to and is now bound by a fixed price for implementing the changes. It vigorously maintains, however, that the "fixed price" did not include subsequent impact costs occasioned by the changes.

even an oblique reference to factual disputes related to costs unassociated with the changes. Indeed, in the accompanying memorandum NRM stated, "All that this lawsuit seeks to obtain is appropriate compensation for the unabsorbed overhead caused by the total changes which were ordered, and which were not, and were not intended to be[,] negotiated in the prices for labor, material and services involved in performing the individual changes." [10] Plaintiff NRM Corporation's Reply To Defendant Hercules Incorporated's Motion For Summary Judgment, filed July 2, 1979, at 19–20. We decline the invitation to disturb the District Court's judgment on the basis of a purported factual dispute appellant failed to present below.[11]

## B. Impact and Delay Costs Caused by the Modifications

The more difficult question is the status of the costs in the second category—the delay and disruption costs attributable to the five modifications. NRM asserts, as it did before the District Court, that the parties' intentions—specifically, whether they intended to include impact costs within the scope of the modification agreements—present a genuine and material issue of fact, thus rendering summary disposition improper. In particular, NRM contends that under the "Federal law of Government contracts," the body of law contractually selected by the parties for resolving disputes growing out of the agreement,[12] the mere existence of a fixed price modification does not preclude subsequent claims for impact costs unless the parties intended that the agreement have that effect.

 While we will, of course, honor the contractual choice of law clause,[13] in most respects relevant to this controversy the "Federal law of Government contracts" dovetails precisely with general principles of contract law. Thus, under both bodies of law, the judicial task in construing a contract is to give effect to the mutual intentions of the parties.[14] *Hodges v. Evans Financial Corp.*, 707 F.2d 1566, 1568 (D.C.Cir.1983); *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 550, 195 Ct.Cl. 21 (1971). Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties. *E.P. Hinkel & Co. v. Manhattan Co.*, 506 F.2d 201, 204 (D.C.Cir.1974); *Appeal of McGrew Ma-*

10. Read in context, the reference in the memorandum to "the extent of delay attributable to causes other than the changes" concerns only the allegation that NRM itself was responsible for the delay. Plaintiff NRM Corporation's Reply To Defendant Hercules Incorporated's Motion For Summary Judgment, filed July 2, 1979, at 18. Given the repeated statements that the suit concerned only damages stemming from the changes and the focus of the statement of genuine issues, the general language on the first page of the memorandum was insufficient to give the District Court notice that NRM wished to litigate any questions concerning delays unrelated to the changes.

11. Whether NRM's claim for these costs remains in the case on remand we leave to the judgment of the District Court. Presumably, that question will turn on the scope of the complaint, any amendments thereto, or any existing or future orders limiting the issues subject to trial.

12. Paragraph 17 of the contract stated:
APPLICABLE LAW: This order shall be construed and interpreted in accordance with the Federal law of Government contracts as enun-

ciated and applied by the Federal Courts, the Armed Services Board of Contract Appeals and other judicial and quasi-judicial agencies of the Federal Government.

Appellee's Exhibit 1 at 10.

13. See *Gray v. American Express Co.*, 743 F.2d 10, 17 (D.C.Cir.1984) (recognizing ability of parties to agree upon law that will govern contract provided choice bears some substantial relation to the parties to the transaction).

14. We need not enter the thicket of differentiating between wholly subjective intention and an objective measurement of intent. See *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1433 (D.C.Cir.1984) (Wald, J., dissenting). By "intention" we refer to a "manifestation of mutual assent to the exchange." RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981). This definition conforms with the standard generally applied by courts construing federal contracts. See *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551, 195 Ct.Cl. 21 (1971); 1 J. & B. McBRIDE & T. TOUHEY, GOVERNMENT CONTRACTS § 2.10[3] (1981).

*chine Co.*, WDBCA 892, 3 CCF 551 (1945). Only if the court determines as a matter of law that the agreement is ambiguous will it look to extrinsic evidence of intent to guide the interpretive process.[15] *E.P. Hinkel & Co. v. Manhattan Co., supra,* 506 F.2d at 204; *WMATA. v. Mergentime Corp.,* 626 F.2d 959, 961 (D.C.Cir.1980). *See also* 1 J. & B. McBride & T. Touhey, Government Contracts § 2.10[3] (1978) (hereinafter McBride & Touhey).

■ Whether an agreement is clear on its face or ambiguous has a direct bearing on the appropriateness of summary judgment in contract disputes. Generally, interpretation of a facially clear contract is considered a question of law and is for the court. *Pennsylvania Ave. Development Corp. v. One Parcel of Land in D.C.,* 670 F.2d 289, 292 (D.C.Cir.1981); *WMATA v. Mergentime Corp., supra.*[16] Thus, when the parties' intent is "wholly unambiguous" on the face of the agreement, disposition on a motion for summary judgment may be appropriate. *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975); *see Davis v. Chevy Chase Financial Ltd.,* 667 F.2d 160, 161, 169 (D.C.Cir.1981); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2730.1 at 279–280 (2d ed. 1983) (hereinafter Wright & Miller). When, however, the language is unclear and the search for intent extends beyond the four corners of the agreement, the intended meaning of the contract is a disputed and, necessarily, material question of fact and summary judgment is improper. *See Davis v. Chevy Chase Financial Ltd., supra,*

667 F.2d at 169; *Grand Union Co. v. Cord Meyer Development Corp.,* 735 F.2d 714, 717 (2d Cir.1984). *See generally* J. Calamari & J. Perillo, Contracts 124 (2d ed. 1977); Wright & Miller § 2730.1.

■ Application of this legal framework to the case at hand convinces us that the District Court's decision to dismiss the case on a motion for summary judgment was incorrect. The court apparently considered the words and conduct that culminated in each of the five modifications to be so unambiguous that they were susceptible of only a single construction. Thus, finding it unnecessary to go outside the agreements to explore the factual and hotly disputed question of intent, it held as a matter of law that the modification agreements themselves[17] clearly reveal a mutual understanding that all costs, including those for delay and disruption, were incorporated into the fixed price for the changes. Although courts applying the "Federal law of Government contracts" have not taken a wholly consistent position on this question, our examination of the relevant case law has led us to conclude that the modification agreements in this controversy are not so "wholly unambiguous"[18] that they preclude inquiry into the factual question of their intended scope.

Courts construing federal contracts generally have not considered modification agreements independent, conclusive evidence that the parties intended that the agreement include impact costs. Instead such courts consistently have examined all the circumstances surrounding the negotia-

---

**15.** Even if the contract is "completely integrated," the parol evidence rule does not preclude the trier of fact from considering extrinsic evidence in its effort to determine the *meaning* of an ambiguous contract. Restatement (Second) of Contracts §§ 210 & 2114(c) (1981).

**16.** This is so even though the ultimate inquiry in the interpretive process is the intent of the parties, an issue ordinarily considered inherently factual. *See* J. Calamari & J. Perillo, Contracts 43 n. 13 (2d ed. 1977). *Cf. Pullman-Standard v. Swint,* 456 U.S. 273, 287–288, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982). Because the unambiguous terms of the contract are presumed to

embody the intent of the parties, submission of questions of interpretation to the trier of fact is unnecessary.

**17.** We use the term "agreement" to refer not to any particular document or statement but to the aggregation of communications that indisputably led to a binding obligation to perform the changes at a fixed price. The question whether, for example, receipt of the purchase orders constituted the actual moment of agreement we leave for the District Court on remand.

**18.** *Davis v. Chevy Chase Financial Ltd.,* 667 F.2d 160, 161, 169 (D.C.Cir.1981).

tions to determine the intent of the parties. Even strong language in the modification agreement that it constitutes the entire adjustment due the contractor ordinarily is not considered independently dispositive. In the typical case that language serves an important evidentiary function, but the focus of the analysis remains on the ultimate question of the intent of the parties.[19]

Thus in *Chantilly Construction Corp.*, *supra*, 81–1 BCA ¶ 14,863 at 73397, the Armed Services Board of Contract Appeals (ASBCA) noted that the modification agreement stated that it "constitute[d] a full and complete price adjustment." Nonetheless, it upheld the contractor's claims for delay damages. It reasoned:

> We are not persuaded that the quoted language recited in a record silent as to what respondent intended when it employed the language can have the meaning respondent now urges upon us. The

language simply states that the price agreed to constitutes a full and complete price adjustment for all work required by the modification. On its face, therefore, the modification covers only the additional work recited in the modification itself. To conclude that it also encompasses the claim herein asserted would require a showing that both parties understood the language to accomplish that purpose. Such evidence is completely lacking in the record.

*Id.* Similarly, in *Merritt-Chapman & Scott Corp. v. United States*, 458 F.2d 42, 43–45 (Ct.Cl.1972), the Court of Claims, focusing on whether the contractor had reserved the right to make a subsequent claim for impact costs, examined not only the language of the agreement but, in addition, extrinsic testimony to determine the intent of the parties.[20] *See also Carl J. Bonidie, Inc.*,

**19.** Many of the decisions that focus on the intent of the parties frame the analysis by asking whether the modification agreement constitutes a valid "accord and satisfaction" and thus discharges the prior obligations of the parties. *See, e.g., Chantilly Construction Corp.*, 81–1 BCA ¶ 14,863 at 73397 (ASBCA No. 24138); *Emerson-Sack-Warner Corp. v. United States*, 416 F.2d 1335, 1343, 189 Ct.Cl. 264 (1969). Thus, for example, in *Emerson-Sack-Warner* the Court of Claims found that a modification order executed after the contractor had made the requested changes did not preclude a subsequent claim for costs arising out of the modification because the agreement did not satisfy the stringent requirements of a valid accord and satisfaction, which include a "meeting of the minds" concerning the scope of the modification. *See Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949) (setting out elements of accord and satisfaction under federal law of government contracts), *cert. denied*, 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950).

Hercules contends that accord and satisfaction analysis is irrelevant to this case. It maintains that its liability did not arise until the moment NRM agreed to each of the five modifications and that, therefore, the question whether the agreement discharged a prior existing obligation to pay for the changes is not presented.

There is some merit to this reasoning. Although the record is far from clear, NRM apparently does not dispute the factual predicate of Hercules' argument—that none of the costs occasioned by the changes arose before the moment the parties agreed to the modifications. If

that is in fact the case, the agreements themselves could not have discharged a prior obligation. Thus, inquiry into the presence or absence of a valid accord and satisfaction is beside the point.

But that conclusion, of course, does not decide the case. The central question in this controversy is not whether the modification agreements discharged a *pre-existing* obligation of Hercules, but whether the parties intended that the fixed-price agreement include impact costs that might at some *future* point stem from the delays and disruption caused by the changes. As we demonstrate, the parties' intentions with respect to the agreements' scope raise genuine and material issues of fact.

**20.** We recognize that in *Merritt-Chapman* the Court of Claims granted summary judgment even though it had specifically stated that the predicate of its legal analysis was both factual and disputed. 458 F.2d at 43–45. *See also Fraass Surgical Mfg. Co. v. United States*, 505 F.2d 707, 711–712, 205 Ct.Cl. 585 (1974) (resolving question of intent in part by evaluating the conduct of the parties yet, nonetheless, granting summary judgment). The approach of the Court of Claims notwithstanding, we are constrained under federal law to reverse a grant of summary judgment once we have determined that material issues of fact remain unresolved. It is, of course, a given that in a diversity action Rule 56 of the Federal Rules of Civil Procedure defines the standard for summary judgment even though another body of law provides the rule of decision for the substantive issue raised in the case.

82–2 BCA ¶ 15,818 at 78396 (ASBCA No. 25769) (1982) (disclaiming reliance on "pre-printed language" appearing on the agreement and instead evaluating the "context in which [the] supplemental agreement [was] arrived at" to determine whether it "operate[d] as a full settlement").[21]

Absent some express reservation at or before the moment of actually entering into a modification agreement, the party seeking to assert a subsequent claim for delay damages carries a heavy burden. Yet even in this circumstance courts construing government contracts have consistently considered extrinsic evidence in their efforts to determine whether the parties intended that the modification agreement incorporate impact costs. Thus, for example, in both *Fraass Surgical Mfg. Co. v. United States*, 505 F.2d 707, 711–712, 205 Ct.Cl. 585 (1974), and *Cannon Construction Co. v. United States*, 319 F.2d 173, 176, 162 Ct.Cl. 94 (1963), the court looked to the conduct of the parties to determine the intended scope of the modification agreements. Even in *Seeds v. United States*, 92 Ct.Cl. 97 (1940), *cert. denied*, 312 U.S. 697, 61 S.Ct. 731, 85 L.Ed. 1131 (1941), the case primarily relied on by the District Court, the Court of Claims looked at subsequent developments as evidence that the contractor's claim was an "afterthought" and that the parties intended that an earlier agreement dispose of all claims growing out of the contract.[22]

We do not suggest that when the signatory to a modification agreement later seeks impact costs the court must always treat the intent of the parties as a question of fact. Although not the usual case for courts applying the "Federal law of Government contracts," there may well be instances when the clarity of the agreement renders it independently conclusive as a matter of law.[23] *See Brock & Blevins Co. v. United States*, 343 F.2d 951 (Ct.Cl. 1965). We conclude, however, that the present controversy is not such a case. Examining the record, as we must, in the light most favorable to the nonmoving party, we cannot agree with the District Court's implicit determination that the modification agreements are so "wholly unambiguous," *Davis v. Chevy Chase Financial Ltd., supra*, 667 F.2d at 169, that NRM's claim may be dismissed as a matter of law. While at first blush the suggestion in each of the purchase orders that the adjusted price constituted the "Total Revised Commitment" appears clear, NRM alleges that it never signed the forms, much less agreed to that language. It contends that Hercules sent the purchase orders to it *after* the price for additional work and material had been fully resolved. In any event, as we have shown, courts construing similar language in federal government contracts typically have looked beyond the four corners of the agreement to determine whether the parties intended to include delay and impact costs in their negotiations. Especially in light of NRM's alleged efforts to reserve negotiation of delay costs for later consideration, itself a material issue of fact, *Merritt-Chapman & Scott Corp. v. United States, supra*, 458 F.2d at 42, NRM should have an opportunity to present evidence bearing on the material question of the intended scope of the agreements to modify the original contract.

Accordingly, we reverse and remand for proceedings consistent with this opinion.

*So ordered.*

---

21. *Bonidie*, however, is internally inconsistent. In dismissing another claim allegedly growing out of the modification, the court eschewed looking at "context" and relied exclusively on the absence of a reservation at the time of the agreement.

22. The court noted that the decision relied on as the basis for the contractor's claim was not handed down until well after it had agreed to a comprehensive modification agreement. The chronology of events undercut the contractor's assertion that it intended the claim to remain open notwithstanding the agreement.

23. Similarly, there may be instances in which extrinsic evidence is so clear that it cannot fairly be said that the material issue of intent is genuinely in dispute. Summary judgment is appropriate in such cases even though the ambiguity of the contract required looking beyond its four corners to determine intent.