**MESA AIR GROUP, INC., f/k/a Mesa Airlines, Inc. and WestAir Commuter Airlines, Inc., Petitioners,**

v.

**DEPARTMENT OF TRANSPORTATION and Federico F. Peña, Secretary of Transportation, Respondents.**

**Nos. 96–1017, 96–1131, 96–1154 and 96–1189.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 1996.

Decided July 2, 1996.

Kirk K. Van Tine, Washington, DC, argued the cause for petitioners, with whom V. Michael Straus, was on the briefs.

Paul S. Smith, Senior Trial Attorney, United States Department of Transportation, Washington, DC, argued the cause for respondents, with whom Nancy E. McFadden, General Counsel, Paul M. Geier, Assistant General Counsel, Dale C. Andrews, Deputy Assistant General Counsel and Anne K. Bingaman, Assistant Attorney General, United States Department of Justice, and Robert B. Nicholson and David Seidman, Attorneys, were on the brief.

Before: WALD, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Opinion concurring in part and dissenting in part filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

Petitioners seek review of orders of the Department of Transportation requiring them to continue to provide air service under certain subsidy agreements even though the Department has unilaterally reduced the subsidies payable under those agreements. Because we conclude that (1) the subsidy agreements are contracts subject to normal

principles of contract interpretation, not regulations subject to interpretive deference to the Department, and (2) the petitioners' proffered interpretation of the termination clauses in those contracts is most consistent with the apparent intentions of the parties when they entered into the contracts, we set aside the orders on review and remand the case to the Department for further action consistent with this opinion.

## I. Background of the Essential Air Services Program and the instant dispute

### A. The Statutory Framework

In 49 U.S.C. §§ 41731–42, Congress established the Essential Air Services ("EAS") Program, a system whereby the federal government, acting through the Department of Transportation ("DOT"), subsidizes air transportation to and from airports in certain eligible communities. The justification for the subsidies is that they make it possible for the private air carrier recipients of the subsidies to provide service to certain communities that otherwise would have none because they are unable to generate a sufficient demand for the service to meet its cost. The EAS statute provides that the Secretary of Transportation "shall pay compensation ... at times and in the way the Secretary decides is appropriate," and gives the Secretary authority to end subsidy payments "when the Secretary decides the compensation is no longer necessary to maintain basic essential air service to the place." 49 U.S.C. § 41733(d). Section 41737(a) grants the Secretary the authority to "prescribe guidelines governing the rate of compensation payable" under the EAS program, and § 41737(d) allows the Secretary to "make agreements and incur obligations from the Airport and Airway Trust Fund ... to pay compensation under this subchapter." Section 41737(d) also provides that "[a]n agreement by the Secretary under this subsection is a contractual obligation of the Government to pay the Government's share of the compensation."

DOT issues orders detailing its compensation agreements with private air carriers. These orders describe the specific service to be provided and the dollar amount of the subsidies to be paid. Once an air carrier enters into a subsidy agreement, its ability to discontinue service as required by the agreement is governed by 49 U.S.C. § 41734. That section provides, among other things, that carriers must give ninety days' notice before ending or reducing any service provided under the agreement. If, at the end of ninety days, DOT has found no replacement carrier for the carrier giving notice, the Secretary "shall require the carrier" to continue providing service for thirty days. The statute provides for successive thirty-day extensions of the service requirement until DOT finds a replacement carrier. It also provides for a compensation formula for carriers providing service under such extensions. Should a carrier refuse to continue providing service, DOT can assess civil penalties under 49 U.S.C. § 46301.

In recent years Congress has funded the EAS program at levels below DOT's estimated requirements. For fiscal year 1989, for instance, Congress appropriated only $25 million when DOT estimated that well over $30 million would be necessary to meet the program's 1988 requirements. Still more funds would have been needed to implement certain upgrades in service ordered by Congress in 1987. A supplemental appropriation solved some of the funding difficulties, but that legislation also barred subsidies that amounted to more than $300 per passenger. DOT accordingly eliminated the subsidies with respect to six communities and released the air carriers from all obligations without any requirement of notice or continuing service. Order 89–9–37 (September 28, 1989). For fiscal year 1990, Congress again underfunded the EAS program and eliminated subsidies for certain distances from hubs and all subsidies amounting to more than $200 per passenger. DOT again had to cancel some subsidies altogether, this time to twenty communities, releasing the air carriers from all obligations. Orders 89–12–29 (December 19, 1989) and 89–12–52 (December 29, 1989).

Another round of underfunding and congressional elimination of subsidies on the basis of distance and cost per passenger for fiscal year 1994 led to DOT's elimination of subsidies for twelve more communities. Or-

ders 93–10–48 (October 29, 1993); 93–11–44 (November 30, 1993); and 94–5–11 (May 9, 1994). Once again, DOT released the air carriers from all obligations under the subsidy orders without any requirements of notice or temporary continuation of service. A similar series of events occurred for fiscal year 1995. *See* Order 94–10–20 (October 17, 1994). For fiscal year 1996, Congress cut the EAS program appropriation by one-third and again tightened distance and cost-per-passenger requirements. But DOT contends that this time, Congress also determined that the funding cuts should be borne proportionally by all airlines receiving subsidies, so that no community would lose its essential air service. DOT supports this reading of congressional intent by quoting an explicit statement in the Conference Committee report:

> The conferees fully intend that all essential air service communities that are participating in the program in fiscal year 1995 will continue to be eligible for participation in the essential air service program in fiscal year 1996, albeit at reduced levels. The conferees expect that the Department may be required to make pro-rata reductions in the subsidy or daily/weekly service levels to manage the funding reductions included in the conference report.

H.R.Rep. No. 286, 104th Cong., 1st Sess. 20 (1995).

### B. The Instant Dispute

In the instant case, DOT has entered into subsidy agreements with Mesa Air Group, Inc. ("Mesa") (formerly known as Mesa Airlines, Inc.) and WestAir Commuter Airlines, Inc. ("WestAir"). Order No. 94–9–10, dated September 9, 1994, designates Mesa to provide essential air services from September 9, 1994, through August 31, 1996, for the following communities at the indicated annual subsidies:

| *Community* | *Subsidy* |
| --- | --- |
| Alamogordo/Holloman Air Force Base, New Mexico | $277,360 |
| Clovis, New Mexico | $310,860 |
| Silver City/Hurley/Deming, New Mexico | $408,814 |
| Kingman and Prescott, Arizona | $325,760 |
| Worland, Wyoming | $167,583 |
| Cortez, Colorado | $144,273 |

Order No. 94–10–16, dated October 14, 1994, designates Mesa to provide essential air services from November 1, 1994, through October 31, 1996, for Dodge City, Kansas, Garden City, Kansas, Goodland, Kansas, Great Bend, Kansas, Hays, Kansas, Lamar, Colorado, and Liberal, Kansas/Guymon, Oklahoma. The subsidy for these services is set at$1,204,973. Order No. 95–5–25, dated May 22, 1995, designates WestAir to provide essential air services from May 1, 1995 (or whenever WestAir could implement the newly agreed-upon services, whichever date is later), through April 30, 1997, for Merced, California, and Visalia, California. The subsidy for these services is set at $700,463.

Upon Congress' action on the fiscal year 1996 EAS budget, DOT quickly responded by issuing Order 95–11–28 (November 17, 1995).

That order implemented "on an emergency basis program-wide reductions in essential air service subsidy payments and service levels." Order 95–11–28 at 1. DOT cited the conference report's language anticipating that no communities would have their essential air service canceled and concluded that it must make across-the-board cuts in service levels and subsidy payments. *Id.* at 2. It accordingly adopted three service-cutting guidelines: subsidies would no longer be available for (1) more than one hub, (2) more than five days per week (compared to the previous six days per week), and (3) more than two round trips per service day (approximately fifty communities had received three or more subsidized round trips per day).

DOT also adjusted subsidy payments to reflect the diminution in service that the

subsidized carriers would be expected to provide. In calculating the new amounts, the Department recognized that reduced service requirements would not reduce the air carriers' fixed costs of providing service, so it raised the per-flight subsidy "so as to cover a greater portion of air carrier fixed costs for each flight than the previous subsidy payments had." DOT Brief at 12. Of course, the larger per-flight subsidies would be paid on a significantly smaller number of flights. The newly imposed subsidies for the orders involved in this case are:

| Community | Airline | Old Annual Subsidy | New Annual Subsidy |
|---|---|---|---|
| Alamogordo/Holloman Air Force Base, NM | Mesa | $ 277,360 | $166,705 |
| Clovis, NM | Mesa | $ 310,860 | $200,332 |
| Silver City/Hurley/Deming, NM | Mesa | $ 408,814 | $263,458 |
| Kingman and Prescott, AZ | Mesa | $ 325,760 | $189,326 |
| Worland, WY | Mesa | $ 167,583 | $145,239 |
| Cortez, CO | Mesa | $ 144,273 | $ 92,976 |
| Dodge City, KS, Garden City, KS, Goodland, KS, Great Bend, KS, Hays, KS, Lamar, CO, and Liberal, KS/Guymon, OK | Mesa | $1,204,973 | $763,947 |
| Merced, CA and Visalia, CA | WestAir | $ 700,463 | $364,241 |

Order 95–11–28 (November 17, 1995), Appendix A, at 1.

On December 8, 1995, only three weeks after DOT issued its emergency subsidy reduction order, Mesa notified DOT that it would terminate all subsidized service in Silver City, New Mexico, Kingman, Arizona, Goodland, Kansas, and Lamar, Colorado, as of January 1, 1996. WestAir notified DOT on the same day that it would terminate all subsidized service in Visalia, California, and Merced, California, as of January 1, 1996. Both air carriers relied on a termination clause contained in the orders establishing the subsidies:

> If the Government terminates payments provided for under this order because of insufficient appropriated funds, then, at the end of the period for which the Government does make payments, the carrier may terminate or reduce the service provided for under this order without regard to any requirement for notice of such termination or reduction.

Order 94–9–10 (September 9, 1994) at 11.[1] Mesa and WestAir also claimed that they would lose money on the subsidized service to the communities named in their notices of termination of service. On December 21, 1995, the air carriers filed petitions for reconsideration of Order 95–11–28, the order implementing the subsidy reductions, detailing their objections to the reductions. DOT considered the air carriers' submissions, but concluded that it had merely "reduced" the subsidy payments, not "terminated" them, and

---

**1.** The termination clauses in Orders 94–10–16 and 95–5–25 are substantially the same. The slight discrepancies between these clauses and the one in Order 94–9–10 are italicized here:
> If the *Department* terminates payments provided for under this order because of insufficient appropriated funds, then, at the end of the period for which the *Department* does make payments, the carrier*s* may *suspend* the services provided for *by* this order without regard to any requirement for notice of such *suspension.*

Order 94–10–16 (Oct. 14, 1994) at 6.
> If the Government terminates payments provided for under this *agreement* because of insufficient appropriated funds, then, at the end of the period for which the Government does make payments, the carrier may *cease to provide* the service provided for under this *agreement* without regard to any requirement for notice of such *cessation.*

Order 95–5–25 (May 22, 1995) at 5.

that therefore, the air carriers' notices of termination were best construed as statutory ninety-day notices of intent to discontinue service. The Department accordingly ordered the air carriers to continue providing service at the communities in question for ninety days (and for an additional thirty days after that, unless alternative carriers could be found by that time). Order 95–12–40 (December 22, 1995) at 6.

On December 27, 1995, Mesa and WestAir filed a complaint in federal district court seeking declaratory and injunctive relief from DOT's Order 95–12–40 as well as a temporary restraining order. *Mesa Air Group, Inc. v. Department of Transportation*, No. 95–2383 (D. D.C. January 5, 1996). The District Court denied the request for the restraining order. DOT then argued that the District Court had no jurisdiction over the case because only the court of appeals may review final orders of the Department. *See* 49 U.S.C. § 46110 (providing for judicial review of DOT orders in federal courts of appeal). The air carriers stipulated their agreement to the District Court's lack of jurisdiction and, with DOT's agreement, transferred the case here under the Transfer Act, 28 U.S.C. § 1631. When Order 95–12–40 had expired, DOT issued Order 96–3–62 (March 28, 1996), extending the holdover period another thirty days. When those thirty days were up, DOT issued a third holdover order, Order 96–4–44 (April 25, 1996). We granted motions to consolidate the air carriers' challenges to the second and third holdover orders with their challenges to Order 95–12–40. We now consider the air carriers' claims.

## II. Discussion

### A. Contract or Regulation?

A significant part of the dispute in this case concerns the nature of the orders establishing the subsidies. DOT argues that the orders are the equivalent of departmental regulations and that the interpretation of the orders is subject to substantial deference by the court. *See Delta Air Lines, Inc. v. Department of Transportation*, 51 F.3d 1065, 1067 (D.C.Cir.1995) ("The court will reverse the Department's interpretation of its regula-

tions only if it is plainly erroneous or inconsistent with the regulations."). On the other hand, Mesa and WestAir argue that the orders are contracts subject to interpretation under regular principles of contract law.

■ We resolve the dispute over the nature of the orders in favor of the carriers. 49 U.S.C. § 41737(d)(1), which establishes the Secretary of Transportation's authority to enter into subsidy agreements with air carriers, provides that "[t]he Secretary may make agreements ... to pay compensation under this subchapter. *An agreement by the Secretary under this subsection is a contractual obligation of the Government* to pay the Government's share of the compensation." (emphasis added). The terms of the statute indisputably establish Congress' intent to make the subsidy agreements contracts, not administrative regulations. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The orders establishing the subsidies are contracts, not departmental regulations. They are therefore subject to interpretation under the neutral principles of contract law, not the deferential principles of regulatory interpretation.

### B. Breach or Permissible Adjustment?

■ "[T]he judicial task in construing a contract is to give effect to the mutual intentions of the parties.... Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties." *NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 681 (D.C.Cir. 1985). However, when a court determines that a contract's language is ambiguous as a matter of law, it must consider other factors in determining the intentions of the parties in constructing the agreement. *Id.* at 682. To be sure, the existence of an ambiguity must be demonstrated by objective evidence. *Carey Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548, 1557 (D.C.Cir.1991). The relevant

contractual language in this case provides that the air carrier may stop providing its services "[i]f the Government terminates payments provided for under this agreement." Order 95–5–25 at 5. Mesa and WestAir argue that the phrase "provided for under this agreement" indicates that "terminates" refers to a termination of the *exact* payments contemplated by the contract. DOT argues, on the other hand, that "terminates" means terminates *completely* (i.e., reduces to zero). Although at first glance the air carriers' reading of the contract appears more reasonable, there is significant ambiguity in the meaning of the language on this point. The contract does not say, for instance, "terminates or reduces." Nor does it say "terminates completely." In light of this ambiguity, we find it necessary to ascertain the parties' intent behind the provision.

■ DOT raises numerous arguments in support of its interpretation of the relevant language. Several of them center on the overall statutory purpose and regulatory framework of the EAS program itself. First, it notes that the EAS statute requires DOT to "review periodically the level of basic essential air service for each eligible place . . . [and to] make appropriate adjustments in the level of service." 49 U.S.C. § 41733(e). 14 C.F.R. § 271.8(b) allows the Department to adjust the subsidy during a rate period if "an adjustment is required in the public interest." Second, DOT claims that the broad interpretation of "terminates" urged by Mesa and WestAir would undermine the EAS statute's purpose of assuring continued essential air service to designated communities. Third, DOT points to the Conference Committee's instruction that no community should lose all of its essential air service as a result of the 1996 appropriations cutbacks.

These arguments from the statutory structure are ultimately unpersuasive because each piece of the legislative structure cited by DOT is just as compatible with the air carriers' proposed definition of "terminates" as it is with DOT's definition. 49 U.S.C. § 41733(e) and 14 CFR § 271.8(b) allow DOT to review and adjust the level of service and the subsidies, but any resulting changes to the subsidies could be accomplished by nego-

tiation, not administrative fiat. As for the claim that the air carriers' interpretation of "terminates" would undermine the statute's purpose of maintaining essential air services, it is persuasive only if we assume that maintaining service is the *only* goal of the legislation. But Congress has clearly indicated its intent to provide protection to the subsidized air carriers as well by making the subsidy agreements contractual obligations of the government. Finally, even the statement in the conference report about not eliminating service to any community completely did not require DOT to take the approach it took. Mesa and WestAir point out that DOT could have continued subsidies at pre–1996 levels for several months while attempting to negotiate new subsidies. At the least, it could have attempted to reach some emergency agreement with the existing subsidy recipients. Instead, DOT chose to unilaterally adjust the subsidy contracts.

DOT also points to the language in the contractual termination clause anticipating a shortfall of appropriated funds. The termination clause opens by noting that "[f]unds required for this fiscal year are currently available. Subsidy payments under this order for future fiscal years are subject to the availability of funds." Order 95–5–25 (May 22, 1995) at 5. The Department argues that this language indicates that the parties to the agreement anticipated just the sort of situation that occurred with the 1996 underfunding. The language certainly supports that conclusion. However, the remainder of the clause explains what the air carriers may do in such a situation—"at the end of the period for which the Government does make payments, the carrier may cease to provide the service provided for under this agreement without regard to any requirement for notice of such cessation." *Id.* We simply cannot accept the Department's proposition that this clause mandates a continuation of service in the face of an across-the-board reduction in funding of the sort at issue in this case.

Next, DOT argues that Mesa and WestAir did not properly document their claimed losses under Order 95–12–40. But the size (or even the existence) of losses to the air carriers is not the relevant question. The termi-

nation clause does not limit the air carrier's ability to terminate service to cases where the air carrier suffers a significant, demonstrable loss; it allows the air carrier to terminate service "[i]f the Government terminates payments provided for under this agreement because of insufficient appropriated funds." Order 95–5–25 (May 22, 1995) at 5. So any failure on the carriers' part to sufficiently document their losses in their notices of termination carries no weight in these proceedings.

Finally, DOT stresses that it has no legal authority to spend nonappropriated funds or to contract for their expenditure in the future. That is, it *cannot* pay the full subsidies anticipated in the contracts because the appropriated funds are insufficient to cover those commitments. This might be a good defense if Mesa and WestAir were trying to collect on the contracts, but that is not what the air carriers are doing. Rather, they are simply trying to terminate the contracts altogether. DOT's claim amounts to an argument that the air carriers *cannot* fail to fulfill their end of the bargain *specifically because* the government is unable to fulfill its end. Such a claim is totally illogical and without any precedent in contract law. It also rings hollow in light of DOT's statutory obligation to reimburse air carriers for their services provided during ninety-day (or subsequent thirty-day) holdover periods—if DOT forces the carriers to provide service, the carriers may reasonably ask how the Department would propose to reimburse them in light of its inability to spend nonappropriated funds.

Mesa and WestAir also raise several arguments favoring their interpretation of the termination clause, but their strongest contention is that the phrase "payments *provided for under this agreement*," *id.* (emphasis added), indicates that the payments made must be the payments specified in the agreements, not unilaterally reduced payments. This interpretation is quite natural and makes sense in light of the entire statutory scheme. First, it is the most logical way to give effect to the words, "payments provided for under this agreement." In the case of Clovis, New Mexico, for example, the subsidy order selecting Mesa provides for a subsidy

of $310,860. DOT has announced that it will henceforth pay only $200,332 in subsidy. $200,332 is *not* the payment "provided for under [the] agreement." Second, the carriers' interpretation provides reasonable protection for the carriers, who by entering into the EAS program have subjected themselves to potentially onerous requirements of providing service against their wishes under the various holdover provisions. The termination clause assures the carriers that they *can* withdraw if the government reduces or eliminates the funding for the subsidies.

Our colleague's dissent stresses that in one version of the contract, the clause reads, "If the Government terminates payments provided for under this order ... the carrier may terminate *or reduce* the service provided for under this order." (emphasis added). While this language indeed appears in Order 94–9–10 (though not in Orders 94–10–16 or 95–5–25) insofar as it has effect upon the meaning, it appears to us that inclusion of the two emphasized words support the interpretation sponsored by Mesa rather than that of the government. If the phrase "if the Government terminates payments provided for under this order" referred only to a complete cessation of payment, it is difficult to see why the contract would have afforded the carriers the option of choosing between terminating and reduction as opposed to merely the option of terminating. Surely a carrier would have little interest in merely reducing its service in the face of a total cessation of payments. Rather, the clause gives the carrier the option of reducing its service in response to a termination of the agreed payments by reduction rather than by total cessation.

Further, petitioners' interpretation, unlike the Department's, cannot yield an absurd result. Under the Department's interpretation, there is no logical stopping point. We find it problematic to accept the proposition that these carriers or any other vendors would have entered agreements under which the buying party could reduce payments by any percent it chose short of 100 percent and yet the selling party would be compelled to perform at the original contract level, or at a

level unilaterally determined by the other party.[2]

■ Furthermore, while not necessary to our resolution of the issues before us, we note that the principle of *contra proferentum* would compel the same result. *Contra proferentum* is a basic principle of contract law which provides that "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts, § 206 (1979); *see also Carey Canada*, 940 F.2d at 1554–55; *Gray v. American Exp. Co.*, 743 F.2d 10, 18 (D.C.Cir.1984). DOT drafted the subsidy agreements, including the termination provisions. Of course, *contra proferentum* is normally limited in its application to "cases of doubt, . . . [where] other factors are not decisive," Restatement (Second) of Contracts, § 206 cmt. a (1979); *Carey Canada*, 940 F.2d at 1554–55 (characterizing *contra proferentum* as a "last resort" under Illinois and Florida law), and that is not the case we have before us today. DOT has raised several arguments in favor of its interpretation, none of which are persuasive. Mesa and WestAir have raised a compelling argument in reliance on the phrase, "payments provided for under this agreement," one ultimately strong enough to resolve the case without resort to the rule of *contra proferentum*, but even if that argument were not sufficient by itself, it would at least compel us to repair to this rule of last resort, which would mandate the same result.

Once we construe the meaning of the termination clause against DOT, its drafter, the resolution of this case becomes clear—DOT has terminated the payments contemplated by the subsidy agreements, and Mesa and WestAir therefore have the right to terminate air services without notice. We therefore set aside Orders 95–12–40, 96–3–62, 96–

4–44, 96–5–29 and 96–6–34, in which DOT ordered Mesa and WestAir to continue providing service under the statutory holdover provisions. Mesa and WestAir are authorized under the termination clauses of their subsidy agreements to terminate immediately service to the communities for which DOT has unilaterally reduced the subsidy payments. We decline the air carriers' invitation to appoint a special master to calculate any damages which DOT may owe for ordering Mesa and WestAir to continue service under Orders 95–12–40, 96–3–62, and 96–4–44. Instead, we remand the case back to DOT for action consistent with this opinion on Mesa and WestAir's notices of termination of service and petitions for reconsideration of Order 95–11–28.

WALD, Circuit Judge, concurring in part and dissenting in part:

While I agree with my colleagues' conclusion that the termination clause here should be analyzed under general contract principles, I disagree with their interpretation of this contractual language:

> If the Government terminates payments provided for under this order because of insufficient appropriated funds, then, at the end of the period for which the Government does make payments, the carrier may terminate or reduce the service provided for under this order without regard to any requirement for notice of such termination or reduction.

Order 94–910, *reprinted in* App. 123.

As the majority correctly notes, absent evidence to the contrary we "assume that the meaning ordinarily ascribed to . . . words reflects the intentions of the parties." *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C.Cir.1985).[1] The ordinary definition of "terminate" is "to bring to an *ending* or *cessation* in time, sequence or continuity," or "to *end* formally and definitely." Webster's Third New International Dictionary 2359

---

**2.** Neither do we find the dissent's discussion of the legal obligations of carriers operating "eligible place" service without contracts to be germane to the interpretation of the contracts obligating the carriers before the court.

**1.** I can find no such evidence to the contrary. Previously, when Congress reduced EAS funding, DOT *terminated* payments for certain cities rather than making the *pro rata* reductions it made here. The termination clause appears to be directed principally to that situation.

(1976) (emphasis added). Thus, it would have been redundant for DOT to have written "terminates completely," which the majority says would have rendered the order unambiguous. Maj. op. at 504.

Moreover, the clause says that "If the government *terminates* payments ... the carrier may *terminate or reduce* the service" required under the order (emphasis added). If "terminates" really means "terminates or reduces" in the first part of the clause, as the majority says it does, then the word "reduce" as used in the second part would be superfluous, in contradiction of the basic principle that "an interpretation which gives a[n] ... effective meaning to all the terms is preferred to an interpretation which leaves a part ... of no effect." RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981).[2]

My colleagues say that the phrase "provided for under this order," which directly follows "payments" somehow changes the meaning of "terminates." Maj. op. at 505. I fail to understand why. All the "provided for" phrase does is specify *which* payments, if terminated, will allow the carrier to terminate or reduce service. Some such limiting phrase was necessary to specify the payments whose discontinuation would allow the airline to terminate or reduce service.[3] In any case, I see no real difference between "If the government terminates payments ..." and "If the government terminates payments provided for under this order ...." insofar

as defining what constitutes termination. In the absence of strong evidence to the contrary—and there is none here—the word "terminate" should be given its ordinary meaning, and the termination clause should be construed to apply only if DOT discontinues subsidy payments entirely.

The majority argues that this interpretation could lead to absurd results, because DOT could reduce the subsidy to a pittance yet not trigger the termination clause. *See* Maj. op. at 506. I agree that even if DOT reduced the subsidy by 99% the *termination clause* would not kick in to allow the carriers to terminate the contracts. But the carriers would not be without legal recourse. DOT is not free to arbitrarily determine the amounts it will pay airlines. Rather, it is required by statute to "determine the reasonable amount of compensation," to be paid to the airlines, which must include "expense elements based on representative costs of air carriers." 49 U.S.C. § 41737(a) (1994). DOT thus has no legal authority to make the airlines fly without adequate compensation as defined in the statute, and if DOT reduced the subsidies below a reasonable level, the carriers could pursue any and all remedies legally available against the agency, possibly including cessation of service.

To the contrary, it is the majority's interpretation which leads to absurd results. Under the EAS program, carriers who service an "eligible place" cannot simply drop their

2. The majority is only speculating on the economics of the situation here when it predicts, "[s]urely a carrier would have little interest in merely reducing its service in the face of a total cessation of payments." Maj. op. at 505. For all we know, a carrier might find it profitable to fly to a remote area a few times a week, even without the subsidy it needs to ensure more frequent service. If the subsidy were terminated, the airline would then want to reduce its flights, not end them completely.

3. If the phrase under dispute were omitted, the provision would be ambiguous in several respects, as it would read:

   If the Government terminates payments because of insufficient funds, then, at the end of the period for which the Government does make payments, the carrier may terminate or reduce the service without regard to any re-

quirement for notice of such termination or reduction.

*Which* payments would it refer to? *Which* service would the carrier be able to terminate or reduce? The same carrier may have several different subsidy contracts with DOT for servicing different routes (three such contracts are involved in this litigation). The words "provided for under this order" are necessary, in my opinion, merely to delimit the scope of the termination clause.

Had the parties wished to provide that *any* reduction in payments would trigger this clause, they had many much clearer ways of doing so (*e.g.*, "If the Government terminates or reduces payments provided for under this order ..."; "If the Government does not meet its obligations under this agreement ..."; "If the Government modifies the payments provided for under this order ...").

service, even if they were originally providing service *without government compensation.* *See* 49 U.S.C. 41733(a) (90–day notice required).[4] The upshot of the majority's opinion, however, is that those airlines who *had* been receiving subsidies can simply walk away from their obligations if their compensation is even slightly reduced, while those airlines who had been serving areas without subsidies must continue service, receiving payments under the statutory compensation formula, even if they wish to terminate service immediately.

Here, DOT reduced payments to Mesa, but also reduced its obligations to fly the routes. This may or may not have been a reasonable approach.[5] If Mesa believed the new payments did not qualify as a statutorily required "reasonable amount of compensation" in relation to its obligations, it could have challenged DOT's reductions. But rather than pursuing this route, Mesa attempted to get out of its contractual obligation altogether. Mesa remains free to challenge DOT's determination of the reduced payments as inconsistent with the statute, but I do not believe it had the *contractual* right to invoke a clause which by its terms only applies when payments are *terminated.*

For the foregoing reasons, I respectfully dissent.

---

4. A formerly-uncompensated airline which wishes to terminate service must notify the Secretary, who may require it to continue flying, and who, after 90 days must, pay the airline its "fully allocated cost ... plus a reasonable return on investment that is at least 5 percent of operating costs." 49 U.S.C. § 41734(e).

5. Mesa, for example, argues that it has certain fixed costs which it incurs regardless of the number of weekly flights it offers, and that DOT did not adequately account for those costs in determining the size of the subsidy reduction.