BAP Appeal No. 21-5    Docket No. 110    Filed: 11/23/2022    Page: 1

**FILED**
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

**November 23, 2022**

**Blaine F. Bates**
**Clerk**

NOT FOR PUBLICATION[1]

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

_____

IN RE ROBERT BRETT KRAMER,

    Debtor.

_____

PATRICK J. MALLOY, III, Chapter 7
Trustee,

    Appellant,

v.

ROBERT BRETT KRAMER, NATALIE L.
STRIMPLE, ZACHARY K. KRAMER,
HANNAH L. DESPAIN, MATTHEW B.
KRAMER, KIMBERLY MCCLUNG, and
MATT KRAMER,

    Appellees.

_____

TRAK-1 TECHNOLOGY, INC.,

    Appellant,

v.

ROBERT BRETT KRAMER, NATALIE L.
STRIMPLE, ZACHARY K. KRAMER,
HANNAH L. DESPAIN, MATTHEW B.
KRAMER, KIMBERLY MCCLUNG, and
MATT KRAMER,

    Appellees.

BAP No. NO-21-005
BAP No. NO-21-006


Bankr. No. 19-12014
Chapter 7


OPINION

---

[1] This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

_____

Appeal from the United States Bankruptcy Court
for the Northern District of Oklahoma

_____

Submitted on the briefs.[2]

_____

Before **ROMERO**, Chief Judge, **JACOBVITZ**, and **ROSANIA**,[3] Bankruptcy Judges.

_____

**ROMERO**, Chief Judge.

_____

A property interest in a closely held entity is intended to be just that—closely held by its members. Thus, when one member of a closely held LLC files bankruptcy, leaving the fate of the debtor's interest in the hands of a trustee, a tension between the non-debtor members' rights and interests in the LLC and the trustee's obligations to maximize the value of the estate necessarily arises. Before this Court is the issue of whether transfer restriction provisions in a limited liability company agreement restrict a trustee's ability to sell the debtor's bare economic interest in the entity. Under the facts presented, we conclude they do.

---

[2] The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. Bankr. P. 8019(b).  The case is therefore ordered submitted without oral argument.

[3] Joseph G. Rosania, U.S. Bankruptcy Judge, United States Bankruptcy Court for the District of Colorado, sitting by designation.

## I.    Background

### A.  *The Bankruptcy*

Trak-1 Technology, Inc. ("Trak-1") and Robert Brett Kramer have been engaged in bitter litigation for well over a decade. This epic battle began in 2009 when Trak-1 and Premier Staffing Services, LLC ("Premier Staffing") sued Kramer and his wife in state court. Nine years later, the state court found the Kramers liable to Trak-1 and Premier Staffing for funds Kramer's wife embezzled, which unjustly enriched Kramer. The state court entered a series of orders and judgments currently totaling approximately $3.2 million against Kramer. Shortly after the state court entered its judgment, Kramer filed a voluntary petition for chapter 7 relief in the Bankruptcy Court for the Northern District of Oklahoma. The primary assets in Kramer's bankruptcy were certain LLC interests (the "LLC Interests").[4]

### B.  *The Sale Order and Appeal*

During the course of the bankruptcy, Patrick Malloy, the chapter 7 trustee (the "Trustee") filed a *Notice to Sell Personal Property* (the "Sale Motion") in Kramer's bankruptcy case, seeking to either sell the LLC Interests to Trak-1 for the total amount of $12,000, or conduct an auction in the event a competitive bid arose or a party in interest objected to the Sale Motion. Kramer objected to the Sale Motion, arguing each LLC's operating agreement (the "Operating Agreements") contained transfer procedures and

---

[4] Kramer holds interests in the following LLCs: 2006 Pinnacle Holdings LLC ("Pinnacle"); Native American Fund Advisors LLC ("NAFA"); PJ Oil LLC ("PJ Oil"); Plouton Petrol LLC ("Plouton") (collectively the "LLCs").

restrictions (the "Transfer Restrictions"), with which the Trustee had not complied.

Additionally, certain members of Plouton—Natalie L. Strimple, Zachary K. Kramer,

Hannah L. DeSpain, and Mathew B. Kramer—objected to the Sale Motion, arguing the

proposed sale violated the Transfer Restrictions in the Plouton Operating Agreement.

Finally, Matthew Kramer and Kimberly McClurg, who owned interests in PJ Oil,

objected to the Sale Motion, contending the Trustee must abide by the Transfer

Restrictions in the PJ Oil Operating Agreement.

The Trustee's response noted he intended to sell only Kramer's capital interests—

not Kramer's full membership interests—in the LLCs. According to the Trustee, such

distinction mattered because the Transfer Restrictions, as applied to the sale of the capital

interests,[5] were unenforceable under applicable state and bankruptcy law.

Following a hearing on the Sale Motion, the Bankruptcy Court entered the *Order*

*Regarding Trustee's Notice to Sell Personal Property* (the "Sale Order") concluding the

Transfer Restrictions were enforceable under Oklahoma and bankruptcy law and applied

to membership and capital interests alike. Thus, the Bankruptcy Court held the Trustee

---

[5] The parties use the terms "capital interest" and "economic interest" interchangeably throughout briefing to refer to the right to receive distributions from the LLCs. *See* Trak-1 Corrected Opening Br. 16, n.13 and 17, n.14; Trustee Amended Opening Br. 7, 15. However, the Oklahoma Limited Liability Act, Okla. Stat. Ann. tit. 18, § 2033—the statute at issue—uses the term "capital interest," which encompasses more than just the right to receive distributions as discussed below. Accordingly, we will use the term "capital interest" in the place of "economic interest" with the understanding the Trustee sought to sell the right to share in profits and receive distributions.

could not sell the LLC's capital interests unless he complied with the Transfer Restrictions.

Trak-1 and the Trustee separately appealed the Sale Order on March 2, 2021, and this Court entered an order joining the appeals for briefing and oral argument.

## II.    Jurisdiction

This Court has jurisdiction to hear timely filed appeals from "final judgments, order, and decrees" of bankruptcy courts within the Tenth Circuit, unless a party elects to have the district court hear the appeal.[6] Appellants timely filed their notices of appeal, and a prior motions panel of this Court determined the Sale Order was final.[7] No party elected to have the district court hear the appeal. The Court, therefore, has jurisdiction over this appeal.[8]

---

[6] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[7] *Order Allowing Appeals to Proceed*, BAP ECF No. 21.

[8] As the appeal progressed, Trak-1 filed a stipulated motion requesting to supplement the appellate record (the "Motion to Supplement") with the 2009 Amended Pinnacle Operating Agreement (the "Amended Pinnacle Agreement). This Court entered a limited remand order requesting the Bankruptcy Court resolve whether the Amended Pinnacle Agreement was admitted into evidence and permitting the Bankruptcy Court to admit additional evidence and amend the Sale Order should the Bankruptcy Court deem it appropriate. The panel also denied the Motion to Supplement as both parties had already included the Amended Pinnacle Agreement in the appellate record. On remand, the Bankruptcy Court entered a *Supplemental Report*, concluding no party had offered the Amended Pinnacle Agreement as evidence at trial, and if they had, the outcome would have remained the same. The Bankruptcy Court did not admit the Amended Pinnacle Agreement in evidence or amend the Sale Order on remand. Neither Appellant amended their Notice of Appeal to request this Court's consideration of the Bankruptcy Court's decision in the *Supplemental Report*. Accordingly, we do not address the Bankruptcy Court's decision here.

### III.     Issues on Appeal and Standard of Review

There are three issues on appeal, all concerning questions of law which we review *de novo*. First, whether the Bankruptcy Court correctly interpreted the Oklahoma Limited Liability Company Act (the "Act").[9] Second, whether the Bankruptcy Court correctly interpreted the Operating Agreements.[10] And third, whether the Transfer Restrictions are enforceable against the Trustee under bankruptcy law.[11] Under the *de novo* standard of review, the appellate court gives no deference to the trial court's decision and applies the same standard as the trial court.[12]

### IV.     Analysis

*A. The Act allows an LLC operating agreement to restrict the sale of a capital interest.*

1. The Act

Under § 2012.2(A) of the Act, a limited liability company's operating agreement governs the relationships, rights, duties, and activities of the company and its members. If

---

[9] *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("We conclude that a court of appeals should review *de novo* a [lower court's] determination of state law."); *In re Wagers*, 514 F.3d 1021, 1024 (10th Cir. 2007) ("This Court must also reach its own conclusions regarding state law legal issues, without deferring to the bankruptcy court's interpretation of state law.") (citation omitted).

[10] We conclude that the provisions of the Operating Agreements restricting the transfer of capital interests are unambiguous, and therefore we review the bankruptcy court's construction of those provisions *de novo*. *See In re Amarex*, 853 F.2d 1526, 530 (10th Cir. 1988) (reviewing a bankruptcy court's interpretation of an unambiguous contract de novo) (citing *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985)).

6

the operating agreement is silent, then the Act governs.[13] However, § 2012.2(A)

expressly states an "operating agreement may not vary the rights, privileges, duties and

obligations imposed specifically under" the Act.[14] At issue here is whether the Act

prohibits an operating agreement from restricting capital interest transfers. We conclude

it does not.

Section 2033(A)(1) of the Act governs the transfer of an interest and provides the

following:

> A. Unless otherwise provided in an operating agreement:
>
>> 1. A membership interest is not transferable; provided, however, that a member may assign the *capital interest* associated with a membership interest in whole or in part[.][15]

The Act defines "capital interest" as "the fair market value as of the date

contributed of a member's capital contribution as adjusted for any additional capital

contributions or withdrawals, a person's share of the profits and losses of a limited

---

[11] *In re Mallo*, 774 F.3d 1313, 1317 (10th Cir. 2014) ("[W]e review the bankruptcy court's interpretation of a statute *de novo*.") (quoting *Okla. Dep't. of Sec. ex rel. Faught v. Wilcox*, 691 F.3d 1171, 1173 (10th Cir. 2012)).

[12] *Carlile v. Reliance Standard Life Ins. Co*., 988 F.3d 1217, 1221 (10th Cir. 2021).

[13] Okla. Stat. Ann. tit. 18, § 2012.2(A).

[14] *Id.*

[15] *Id.* § 2033(A)(1) (emphasis added).

liability company and a person's right to receive distributions of the limited liability company's assets[.]"[16]

The parties dispute how to interpret the Act and whether the Act allows an operating agreement to restrict the transfer of a capital interest. The dispute centers on how the prefatory clause—"[u]nless otherwise provided in an operating agreement:" (the "Prefatory Clause")—modifies the subsequent statutory language.[17]

Appellants contend § 2033 creates a right to transfer the capital interest even if the Operating Agreements restrict the transfer of the entire membership interest. In support, Appellants argue the semi-colon after the first clause in (A)(1) indicates the Prefatory Clause applies only to the first clause of (A)(1). Appellees argue to the contrary and assert the colon after the Prefatory Clause signals it modifies all of (A)(1). Both sides cite to cases (non-binding)[18] discussing the grammatical implications of the statute's punctuation use.[19]

---

[16] *Id.* § 2001(5). The legislature amended the Act in 2017. The amendments revised the "capital interest" definition to include the language "a person's share of the profits and losses of a limited liability company and a person's right to receive distributions of the limited liability company's assets[.]" *See* BUSINESS ENTITIES, 2017 Okla. Sess. Law Serv. Ch. 323 (S.B. 769) (West).

[17] *Id.* § 2033(A).

[18] *McLeod v. Nagle*, 48 F.2d 189, 191 (9th Cir. 1931) ("A semicolon is used to show that what follows is grammatically independent, though closely related in thought."); *Gayanich v. Gayanich*, 69 V.I. 583, 590 (2018) ("Basic English grammar dictates that a colon precedes a list, which expands upon and explains the content of the clause preceding it.").

[19] This argument raises a distinction without a material difference in analyzing the intent of § 2033(A). A colon is often used to introduce "an element or a series of elements illustrating or amplifying what has preceded" it. THE CHICAGO MANUAL OF

We conclude the Prefatory Clause modifies all of § 2033(A)(1). Section 2033(A) is structured such that if the Operating Agreement is silent with respect any matters addressed in its six subsections, then the subsection sets forth the default rule. In subsection (1), the default rule states if the Operating Agreement is silent on the matter (*i.e.* unless the Operating Agreement provides otherwise), a membership interest is not transferable; provided, however, a member may assign the capital interest associated with a membership interest in whole or in part. The Operating Agreement may override any aspect of the default rule.[20]

---

STYLE, § 6.61 (17th ed. 2017). Even the Supreme Court has determined a colon limits a series of clauses it precedes. *See Andresen v. Maryland*, 427 U.S. 463, 471 (1976) ("All clauses in the series are limited by what precedes that colon[.]"). However, under *The Chicago Manual of Style*, when a colon is not used to introduce an element or series of elements, colons and semi-colons serve similar purposes—to join independent clauses and signal a close connection between them. *See* THE CHICAGO MANUAL OF STYLE, §§ 6.61, 6.56. Additionally, this style guide instructs the adverb "however" mandates a semi-colon to precede it when it serves as a conjunction between two independent clauses. *Id.*, § 6.57 ("Certain adverbs, when they are used to join two independent clauses, should be preceded by a semicolon rather than a comma. These conjunctive adverbs include *however*[.]"). Section 2033 uses a semi-colon in just that way—to precede the conjunctive adverbial phrase "provided, however[.]" Okla. Stat. Ann. tit. 18, § 2033(A)(1). In short, the punctuation provides no grounds for dispute. The language "[u]nless otherwise provided in an operating agreement:" modifies the entirety of § 2033(A)(1), which allows for an operating agreement to alter both membership and capital interest transfers.

[20] *Cf. In re Hafen*, 625 B.R. 529, 536 (Bankr. D. Utah 2020) (stating that under Utah law an operating agreement can change the "default rule" under the statute that a partner cannot transfer governance rights but the economic right to distributions is freely transferable).

2. Oklahoma Caselaw

Appellants also rely on *Southlake Equipment Co. v. Henson Gravel & Sand, LLC*, to support their contention the Act creates a right to transfer a capital interest free of any restriction on such transfer in an operating agreement.[21] In *Southlake*, applying § 2034, the Oklahoma Court of Appeals held the trial court erred by granting a writ ordering a judgment debtor to transfer his entire membership interest in a limited lability company to the judgment creditor. Section 2034 states "it shall be the sole and exclusive remedy of a judgment creditor with respect to the judgment debtor's membership interest." The court held under § 2034, a judgment creditor may charge only the capital interest of the judgment debtor until the judgment is satisfied, not the entire membership interest.

The court found further the judgment creditor could not rely on § 2033 to compel the transfer of the entire membership interest to it. After quoting § 2033 the court stated, without explanation, "the parties' operating agreement determines if, and how, a membership interest *other than economic* are transferred to non-members" and then noted all members had not consented to transfer of the entire membership interest to the judgment creditor as required by the operating agreement.[22] We do not find the court's suggestion in *Southlake*, in dicta, that an operating agreement cannot restrict the transfer of a member's economic interest to non-members to be persuasive.

---

[21] 313 P.3d 289 (Okla. Civ. App. 2013).

[22] *Id.* at 297 (emphasis added). Of note, the § 2033(A)(1) statutory language was amended in 2017 and changed "economic rights" to "capital interest" which encompasses the economic rights discussed in *Southlake*.

Accordingly, we conclude the Bankruptcy Court did not err because the Act allows an operating agreement to restrict the transfer of a member's capital interest.

B. *The Operating Agreements clearly restrict the transfer of a capital interest for each LLC.*

The Bankruptcy Court concluded the Transfer Restrictions conditioned the assignment of the members' interests, and "portion and parts thereof" and "interests therein," and therefore applied to "the economic portion" of the interests.[23] Appellants contend the Bankruptcy Court erred because Transfer Restrictions do not apply to the transfer of the capital interest for each LLC because the Operating Agreements use the word "portion."[24] "Portion," according to Trak-1, is quantitative and not qualitative in

---

[23] Sale Order at 18, *in* Trustee's App. at 158 ("The Pinnacle Operating Agreement conditions the assignment of membership interests, and portions and parts thereof, and interests therein, which the Court has found to include the economic portion of Kramer's interest, upon compliance with the terms and conditions set forth in Article X."); *Id.* at 21, *in* Trustee's App. at 161 ("Thus, the term "Unit," when used in Article X, means not just the "undivided ownership interest" in NAFA, but also severable interests therein. Trustee has bifurcated the estate's ownership interest into economic and non-economic interests. His notice to sell just the economic interest seeks to assign "an[] interest therein" of the estate's Units, and therefore must satisfy the conditions of Article X."); *Id.* at 24–25, *in* Trustee's App. at 164–65 ("Nothing in Article IX permits the transfer of a member's Capital and Profits Interests, or any other interests, to an *unrelated third party,* however, unless all members consent. . . . Trustee's proposed transfer of an interest akin to the Capital and Profits Interest to someone other than a Permitted Transferee is simply not allowed absent the unanimous consent of the PJ Oil Members."); *Id.* at 29, *in* Trustee's App. at 169 ("Trustee has stepped into Kramer's shoes as a member of Plouton. The estate's right to the financial benefits from Plouton's activities is a "portion" of its membership interest, and thus Trustee is obligated to satisfy the requirements of Article X of the Plouton Operating Agreement.").

[24] Appellants also contend a membership interest may be bifurcated into an "economic" and "noneconomic interest." Appellees agree the Act supports bifurcation of the interests.

11

character, and thus must only refer to a number of units or interests. The Trustee adds a

capital interest cannot constitute a "portion" of a membership interests because it does

not include all the rights accompanying a full ownership interest such as voting and

management.

Each Operating Agreement places a restriction on the members' abilities to

transfer all or a portion of, or any interest in, their ownership interests.[25] For example the

Pinnacle Operating Agreement restricts transfers of all or part of a Unit and provides the

term "'transfer', when used in this Article X with respect to a Unit, shall be deemed to

refer to a transaction by which the Member assigns all or a portion of his Units or any

interest therein, to another Person."[26]

The Operating Agreements do not define "ownership interest," or "interest" but

the Act does. The Act defines "Membership Interest" or "Interest" to mean

> a member's rights in the limited liability company, collectively
> including the member's share of the profits and losses of the limited
> liability company, the right to receive distributions of the limited
> liability company's assets and capital interest, any right to vote or
> participate in management and such other rights accorded to members
> under the articles of organization, operating agreement or the
> Oklahoma Limited Liability Company Act[.][27]

The Act defines "Capital Interest" to mean

> the fair market value as of the date contributed of a member's capital
> contribution as adjusted for any additional capital contributions or

---

[25] Only the PJ Oil Operating Agreement calls the ownership interest an "Interest," the other Operating Agreements call the ownership interest a "Unit."

[26] Pinnacle Operating Agreement at 14, *in* Trustee's App. at 190.

[27] Okla. Stat. Ann. tit. 18, § 2001(16).

withdrawals, a person's share of the profits and losses of a limited liability company and a person's right to receive distributions of the limited liability company's assets.[28]

By definition, a capital interest is a subset (*i.e.* a portion) of the bundle of rights that comprises a full membership interest, namely, "a person's share of the profits and losses of a limited liability company and a person's right to receive distributions of the limited liability company's assets[.]"[29] The restrictions on a member's ability to transfer all or a portion of, or any interest in, its membership interest restricts transfer of the capital interest.

The Bankruptcy Court for the District of Utah analyzed a similar issue under Utah law and concluded a transfer restriction applied to the transfer of a bare economic interest in a limited partnership.[30] There, the bankruptcy court reasoned the transfer restriction applied to the bare economic interest because a partnership interest is the collective of all the interests one has in a partnership, which includes economic and managerial rights, and Black's Law Dictionary defines a legal interest to include "any aggregation of rights, privileges, powers, and immunities."[31] The Utah Bankruptcy Court reasoned a restriction on a transfer of a partnership interest applies to "any of the aggregate rights or powers to manage as well as any rights to distributions which were able to be exercised by the

---

[28] *Id*. § 2001(5).

[29] *Id.*

[30] *In re Hafen*, 625 B.R. 529, 536–37 (Bankr. D. Utah 2020).

[31] *Id.* (quoting *Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Collectively, the word includes any aggregation of rights, privileges, powers, and immunities; distributively, it refers to any one right, privilege, power, or immunity.").

debtor at the time of filing."[32] We find the Utah Bankruptcy Court's decision persuasive and conclude such reasoning holds true under Oklahoma law as applied to the Operating Agreements.

To agree with Appellants and ascribe a narrow definition to the meaning of "portion" would be at odds with the intent of each Operating Agreement—to provide a check on the transfer of an interest to a person not contemplated by the Operating Agreement. Similarly, such a narrow definition would be at odds with the Act, which includes the rights comprising the definition of "capital interest" within its definition of "membership interest."

Accordingly, we conclude the capital interest the Trustee sought to sell makes up a "portion" of the interests subject to the Transfer Restrictions in each Operating Agreement. Therefore, the Transfer Restrictions in each Operating Agreement clearly restrict the sale of any capital interest.

C. *The Transfer Restrictions are enforceable against the Trustee under the Bankruptcy Code.*[33]

Section 541(c)(1) provides a debtor's property interests contemplated by the Code become property of the estate

> notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law –

---

[32] *Id.* at 536.

[33] In its opening brief, Trak-1 asserts the operating agreement should be deemed an executory contract such that § 365 would support the Trustee's right to sell the LLC Interests even if the transfer restrictions were enforceable. Neither Appellant raised this argument below, and Appellants do not argue for plain error review on appeal. The Tenth

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.[34]

Section 541(c)(1)(A) invalidates any restriction or condition that prevents a debtor's interest from becoming property of the estate,[35] and § 541(c)(1)(B) invalidates any clauses—including *ipso facto* clauses[36]—to the extent they expressly or implicitly cause a forfeiture, modification, or termination of a debtor's interest in property from entering the

---

Circuit generally instructs failure to argue for plain error review results in no appellate review. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128, 1131 (10th Cir. 2011) ("[O]ur longstanding practice has been to review newly raised . . . legal arguments under what substantively amounts to (and what we have more recently described as) the plain error standard. . . the failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the [lower] court."). Accordingly, we will not consider this argument, and even if we did, we do not find it persuasive.

[34] 11 U.S.C. § 541(c)(1).

[35] *Id.* § 541(c)(1)(A).

[36] The term "*ipso facto* clause" is not found in the Code, but case law defines it as a contractual term providing that the filing of bankruptcy or insolvency is an event of default. *See In re Ruona*, 353 B.R. 688, 691 (Bankr. D. N.M. 2006) (defining *ipso facto* clauses as those which provide filing a bankruptcy proceeding constitutes default under the contract); *In re Steinhaus*, 349 B.R. 694, 709–10 (Bankr. D. Idaho 2006) ("An *ipso facto* clause renders a debtor in default upon the filing of a bankruptcy petition, regardless of whether the debtor continues to remain current in payments to the secured creditor and in compliance with other obligations under the loan documents.").

15

estate.[37] Accordingly, the Bankruptcy Code will not enforce contractual provisions that prohibit a debtor's property from entering the bankruptcy estate.

Trak-1 contends § 541(c)(1)(A) invalidates all the Transfer Restrictions contained in each Operating Agreement. Trak-1 also argues the consent requirements[38] in the Operating Agreements are invalid under § 541(c)(1)(B). We disagree.

Section 541(c)(1) does not invalidate any of the Transfer Restrictions. First, § 541(c)(1)(A) is meant to protect the transfer of pre-petition personal property to the bankruptcy estate.[39] The Transfer Restrictions here did not prevent the LLC Interests from becoming part of Kramer's bankruptcy estate.[40] Accordingly, the Transfer Restrictions do not violate § 541(c)(1).

Second, only the NAFA and PJ Oil Operating Agreements contain consent requirements,[41] none of which violate § 541(c)(1)(B) because they are not triggered by a

---

[37] 11 U.S.C. § 541(c)(1)(B).

[38] NAFA and PJ Oil's Operating Agreements require the consent of the non-transferring Members to validly transfer a Member's interest in the LLC. NAFA's Operating Agreement only requires a majority vote of the non-transferring Members and PJ Oil's Operating Agreement requires unanimous consent.

[39] *See* 11 U.S.C. § 541(c)(1)(A); *see also In re Polycorp Assocs., Inc.*, 47 B.R. 671, 672 (Bankr. N.D. Cal. 1985) (concluding "§ 541(c)(1)(A) is intended to eliminate barriers to the transfer of property to the estate, and nothing more"); *In re Todd*, 118 B.R. 432, 434–35 (Bankr. D. S.C. 1989) (concluding § 541(c)(1) ensures the debtor's property becomes property of the estate notwithstanding protective provisions).

[40] *See In re Farmers Mkts., Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986); *In re Todd*, 118 B.R. at 434–35; *In re Polycorp Assocs., Inc.*, 47 B.R. at 672; *In re Dean*, 174 B.R. 787, 789–90 (Bankr. E.D. Ark. 1994).

[41] Trak-1 contends the Pinnacle Operating Agreement Section 10.02.A.2 contains a consent requirement mandating the transferee become a "Substitute Member." The

member's insolvency and do not cause a forfeiture or termination of the LLC Interests. Because the Transfer Restrictions do not restrict the LLC Interests from entering the bankruptcy estate, we conclude they do not violate § 541, and are therefore enforceable against the Trustee.[42]

### V.     Conclusion

Because Oklahoma law allows restrictions on transfers of the capital interest in an operating agreement, the Operating Agreements all restrict transfers of capital interests, and the Bankruptcy Code does not preclude enforcement of the restrictions at issue here, we conclude the LLCs' members may enforce the Transfer Restrictions in each Operating Agreement applicable to the Trustee's proposed sale of capital interests. Accordingly, the Bankruptcy Court did not err, and its judgement is AFFIRMED.

---

consent requirement cited does not exist in either the 2006 Operating Agreement or the Amended Pinnacle Agreement. Trak-1 likely makes this assertion because the Bankruptcy Court incorrectly cited this provision in its Pinnacle analysis. However, this provision is found in the NAFA Operating Agreement. *See* Trak-1 Opening Br. 14 and Trak-1 Supplemental Reply Br. 9.

[42] Section 541(c)(1) does not void any restrictions on the transfer of the property from the trustee, as successor to the debtor, to third parties. *E.g. In re Jundanian*, No. 10-21513-TJC, 2012 WL 1098544, at *6 (Bankr. D. Md. Mar. 30, 2012) (unpublished); *In re Todd*, 118 B.R. 432, 435 (Bankr. D.S.C. 1989); *Bomgards Creameries, (In re Shauer)*, 62 B.R. 526, 530 (Bankr. D. Minn. 1986).